Henslee *v.* Boyd.

5-2645    360 S. W. 2d 505

Opinion delivered September 17, 1962.

[Rehearing denied October 22, 1962.]

*Jay W. Dickey* and *Gerland P. Patten,* for appellant.

*Gregory & Claycomb,* for appellee.

George Rose Smith, J. This suit is the outcome of an unsuccessful venture in which the appellant F. Brooks Henslee and the appellee H. Eugene Boyd attempted to engage as partners in the wholesale and retail lumber business. The enterprise was heavily indebted from the outset and lasted for only about three months. Thereafter Boyd brought this suit for a rescission of the partnership contract, asserting fraud in its inducement and a subsequent failure of consideration. The chancellor set aside the contract on the second ground and in effect

directed Henslee to repay everything that Boyd had invested in the venture. The basic question is whether the decree is supported by a preponderance of the evidence.

The partnership was formed on June 2, 1960. Before that time Henslee had been engaged in the same business by himself, near Pine Bluff. His assets included a sawmill, a planing mill, a dry kiln, rolling stock, and miscellaneous equipment. The outstanding indebtedness consisted of a $25,000 mortgage on the sawmill and other property, payable to the Benton State Bank, a $17,000 mortgage on the dry kiln and rolling stock, and about $10,000 owed on various open accounts.

Some years earlier Eugene Boyd, the appellee, had been connected with the sawmill business in Alabama, but in May of 1960 he and his wife had a gift shop in New Mexico. In the latter part of that month Eugene and his brother Barney were in Arkansas seeking to buy timber for a sawmill that Barney owned in Alabama. They heard the Henslee mill in operation near the highway and stopped to ask about the availability of standing timber in the vicinity.

Henslee told them that he had both timber and a mill for sale, as he was not a sawmill man and would like to sell out. It was at first thought that the Boyds would buy the entire business, and a gross value of $70,000 was eventually agreed upon. Barney, however, decided not to enter the transaction when Henslee was unwilling for him to have a weekly drawing account of more than $75 while the purchase price was being paid. After further discussion it was agreed that Henslee would sell a half interest to Eugene Boyd and go into partnership with him. The Boyds returned to Alabama so that Eugene could raise the money for his down payment.

On June 2 Henslee and Eugene Boyd met at the office of a Pine Bluff attorney, where a contract of sale and a contract of partnership were prepared and signed. The two instruments were executed together, in the course of the same transaction, and should be considered as a single contract not only in the matter of interpretation, *Gowen* v.

*Sullins,* 212 Ark. 824, 208 S. W. 2d 450, but also, we think, in the determination of whether rescission is proper.

By the first contract Henslee sold Boyd a half interest in the assets of the business. The agreement recited the valuation of $70,000 and provided that the partnership would assume the $17,000 mortgage and $5,000 of the open accounts, leaving a net worth of $48,000. For his half interest Boyd was to pay a total of $12,000 in cash within sixty days and execute six notes, due semiannually, for the other $12,000. Boyd duly made the cash payments and executed the notes.

The partnership agreement declared that the parties would engage in the lumber business as equal partners, devoting such time and attention to it as should be necessary. Paragraph 7, after referring to an inventory of 80,000 board feet of finished lumber that was owned by Henslee individually, provided that the partnership might sell this lumber to raise operating capital, but the lumber so sold would be replaced within two years.

Paragraph 8 recited that the $25,000 mortgage debt to the Benton State Bank was to be Henslee's personal obligation and would be paid by him "within such reasonable time as is practicable." It was further stated that Henslee would use all the purchase price in excess of the first $5,000, and also any available profits, toward the satisfaction of the bank mortgage. The proof shows that Henslee did not in fact apply Boyd's cash payments immediately to the mortgage debt. Henslee treated the money as his own and at once used $2,500 of it to buy a tract of timber for the partnership. The rest he applied partly to debts and expenses of the partnership and partly to his own personal debts. On September 16, 1960—eleven days after the partnership ceased to be active—Henslee made a payment of $19,000 upon the bank mortgage, reducing its balance to $6,000. This suit was filed a month later, on October 19.

Boyd and his brother testified that in the course of the oral negotiations Henslee said that he would use the cash payments made by Boyd to reduce the bank mort-

gage and that he would also discount Boyd's purchase-money notes and use the proceeds for the same purpose. The Boyds state that Henslee represented that in this way the bank would be paid in full and the sawmill could be mortgaged by the partners to raise operating capital. Boyd attributes the failure of the undertaking to a shortage of operating capital with which to purchase saw logs for the mill.

The chancellor held the Boyd brothers' testimony to be admissible, despite the parol evidence rule. In granting a rescission of both contracts the trial court relied solely upon the fact that Henslee did not promptly apply the purchase money (in excess of the first $5,000) to the payment of the bank mortgage. The chancellor thought this breach of contract to be so material as to amount to a failure of consideration, entitling Boyd to complete restitution.

We lay aside the admissibility of the Boyds' testimony, for we have concluded that even if this proof is considered to be admissible no failure of consideration has been shown. Failure of consideration does not mean, of course, that the agreement was invalid in its inception for lack of consideration. Instead, the phrase means that after the formation of the contract one party so materially defaults in the performance of his promise that the other party is excused from the duty to perform and may, in a proper case, obtain rescission. Corbin on Contracts (1950 Ed.), § 133. Failure of consideration may result not only from complete default but also from a protracted delay in performance. Rest., Contracts, §§ 273 (2) and 276. In chancery the amount of delay that will be condoned varies with the equities of the case. Williston on Contracts (Rev. Ed.), § 852.

We are not convinced that Henslee's delay in making his $19,000 payment to the bank was a material factor leading to the collapse of the venture. By the letter of the contract Henslee was required to apply $7,000 of the cash payments toward satisfaction of a $25,000 mortgage. There is no suggestion that such a small payment would

have brought about a release of the lien. And if Henslee had carried out his alleged oral promise to discount the notes as well, he could not have raised as much as an additional $12,000, leaving a substantial balance still owing to the bank. Henslee actually made from his own funds a payment of $19,000 in September. The record does not support the conclusion that the firm's insolvency would have been avoided if this payment had been made earlier— even at the inception of the partnership.

With many circumstances to be considered we cannot say with assurance that one partner rather than the other was primarily responsible for this business failure. Neither man professed to be a skilled sawmill operator when the partnership was formed. From the beginning the concern was heavily indebted and suffered continually from a lack of sufficient funds to meet its day-to-day expenses. Boyd neglected the business to some extent, being gone for about 37 days in the course of making two extended trips to New Mexico upon personal missions and about five trips to Alabama in search of some one to buy Henslee's remaining half interest. The last straw was apparently a decline in the local demand for lumber, which left the struggling young firm without a dependable market for its production. All in all, the weight of the evidence does not persuade us that Henslee was so exclusively at fault that he should bear the entire loss.

The chancellor made no finding upon the charge of fraud, but Boyd relies upon this issue as an alternative basis for rescission of the contracts. This contention is without merit.

The partnership agreement recited that Henslee would sell to the partnership, as needed, timber growing upon lands owned by him and his wife, at prevailing market prices. The Boyds testified that Henslee orally represented to them that he owned from three to five million feet of standing timber, when in fact a subsequent cruise disclosed his ownership to be only about half a million feet. It is insisted that the venture would not have failed if Henslee had owned all the timber he claimed and had been willing to sell it to the partnership.

The record does not support the assertion that Henslee violated his obligation to sell timber to the firm. It is true that he declined to sell, but the reason was that the concern was unable to pay for the timber. There was no duty on Henslee's part to make a credit sale, and, as we have already indicated, we do not consider Henslee to have been culpably responsible for the partnership's lack of ready cash. Since the firm was never in a position to buy even a substantial part of the timber that Henslee did own, the fact that he did not own a great deal more is immaterial. As a matter of fact, the shortage of saw logs was not nearly so acute as the appellees would now have us believe; for Eugene Boyd in substance admitted on cross examination that the tracts of timber purchased by Henslee for the partnership pretty well kept the sawmill busy from June 2 until the latter part of August. There are other minor charges of fraud, but we do not find them to be well founded.

The appellees' complaint for rescission contains an alternative prayer asking the court to dissolve the partnership and wind up the business. A similar request is made in the appellants' answer. In our view this is the proper action to be taken, and the cause will be remanded for that purpose.

Reversed.