# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-1621

———————————————

Midwest Medical Solutions, LLC; Hugh Bradley

*Plaintiffs - Appellants*

v.

Exactech U.S., Inc.

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: October 21, 2021
Filed: December 29, 2021

——————————

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.

——————————

KELLY, Circuit Judge.

Exactech U.S., Inc. terminated its Sales Agency Agreement (the Agreement) with Midwest Medical Solutions, LLC and Hugh Bradley (collectively, Midwest), after Midwest failed to meet its sales quota for two or more consecutive quarters. Under the Agreement's non-compete provision, Midwest was entitled to Restricted Period Compensation (RPC) after termination. The parties dispute the amount of RPC owed, and Midwest initiated an action in the District of Minnesota seeking,

among other things, a declaratory judgment as to the amount of RPC. Upon Midwest's motion for summary judgment, the district court concluded that the Agreement limited RPC to a total of 7.5 percent of sales during the previous 12 months, divided into six monthly payments. Midwest appeals, arguing the district court misconstrued the Agreement.

I.

Exactech, a manufacturer of orthopedic implants and surgical instruments for hip, knee, and shoulder surgery, entered into an Agreement with Midwest, under which Midwest was the exclusive sales representative for Exactech's products in Minnesota, North Dakota, South Dakota, and LaCrosse County, Wisconsin. Exactech paid Midwest commission between 15 and 22 percent of invoiced sales, depending on the product sold. Exactech could terminate the Agreement by providing 30 days' written notice if Midwest failed to meet the average quarterly total of its quota plan for two consecutive quarters. After termination, Midwest would be subject to a non-compete covenant for 12 months, during which time Midwest could not solicit Exactech customers or employees. The Agreement included an RPC provision, Paragraph 5.D.ii, that would apply during the non-compete period:

> In the event this Agreement is terminated or not renewed by Exactech, then during each calendar month of the first six (6) months after such termination, Exactech will pay [Midwest] an amount equal to seven and one half percent (7.5%) of the total sales in the Territory during the trailing twelve (12) months ending on such termination date (the "Restricted Period Compensation").

The Agreement contained an integration clause, specifying that it represented the entire understanding between the parties and superseded all prior agreements or understandings and that the Agreement could be modified only by written agreement.

By December 31, 2018, Midwest had missed its sales quota for two or more consecutive quarters, and on February 5, 2019, Exactech notified Midwest that it would terminate the Agreement, effective March 7, 2019. Through counsel, Midwest and Exactech disputed the amount Midwest would be entitled to in RPC per the Agreement terms. Both agreed that the total sales for the previous 12 months were approximately $4 million. However, Midwest maintained it was entitled to 7.5 percent of that $4 million to be paid each month for six months, for a total RPC of approximately $1.8 million. Exactech disagreed, contending Midwest was entitled to 7.5 percent of the roughly $4 million in sales to be paid out in six monthly installments, for a total RPC of approximately $300,000.

On March 15, 2019, Midwest brought claims against Exactech in the District of Minnesota.[1] Relevant on appeal, Midwest sought a declaratory judgment that, pursuant to Paragraph 5.D.ii of the Agreement, it was entitled to approximately $1.8 million in RPC. On June 13, 2019, the district court, applying Minnesota law as agreed to by the parties, denied Midwest's motion for summary judgment on the declaratory judgment claim. The district court rejected Midwest's proposed interpretation of Paragraph 5.D.ii and agreed with Exactech's. The district court did not analyze the text of Paragraph 5.D.ii itself but considered other factors to conclude:

> There is no dispute that the purpose of the RPC is to compensate Plaintiffs for a twelve-month non-compete covenant after termination. Reading the sales agreement in this light, the Court finds that the

[1]Exactech filed counterclaims against Midwest, including for reformation based on mutual mistake and rescission based on mutual or unilateral mistake, both with respect to Paragraph 5.D.ii. After the district court denied Midwest's motion for summary judgment on Midwest's claim for declaratory judgment, Exactech amended its answer and counterclaims, retaining only a counterclaim for breach of confidentiality. At oral argument, however, counsel for Exactech expressed the view that the reformation and rescission counterclaims are still in the case. We leave it to the district court to determine the status of any remaining counterclaims upon remand.

agreement clearly and unambiguously limits RPC to 7.5% of the preceding twelve-months sales. This amount bears a reasonable and rational relationship to Plaintiffs' actual fees and commissions under the agreement . . . and the purpose of the compensation.

The parties later stipulated to entry of judgment against Exactech on Midwest's declaratory judgment claim pursuant to the district court's interpretation of Paragraph 5.D.ii. The district court entered judgment on March 1, 2021, ordering Exactech to pay RPC to Midwest in the amount of $287,077.23, plus pre-judgment interest in the amount of $47,128.51.

With a final judgment in hand, Midwest timely appealed, challenging the district court's interpretation of Paragraph 5.D.ii set forth in the summary judgment order.

II.

A party is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case of contract interpretation, construction of an unambiguous contract is a question of law that we review de novo, but if the contract is ambiguous, its meaning is a question of fact, and summary judgment is inappropriate unless evidence of the parties' intent is conclusive. Qwinstar Corp. v. Anthony, 882 F.3d 748, 752 (8th Cir. 2018) (quoting Swift & Co. v. Elias Farms, Inc., 539 F.3d 849, 851 (8th Cir. 2008)).

For a contract to be deemed unambiguous, Minnesota law requires a court to construe the contract as a whole to determine whether it is subject to only one reasonable interpretation. See id. at 754. Where the parties to a contract "express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn. 2003). And "when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained

-4-

construction." Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004). Accordingly, we must first examine the text of Paragraph 5.D.ii to determine whether that provision is unambiguous and, if so, assess the plain and ordinary meaning of the words therein.

Although the parties advocate different interpretations of Paragraph 5.D.ii, both argue on appeal that the provision is unambiguous. In relevant part, Paragraph 5.D.ii provides, "during each calendar month of the first six (6) months after such termination, Exactech will pay [Midwest] an amount equal to seven and one half percent (7.5%) of the total sales in the Territory during the trailing twelve (12) months ending on such termination date."

We agree with the parties and the district court that this provision is unambiguous. The first phrase, "during each calendar month of the first six (6) months after such termination," sets the frequency and number of payments. The second phrase, "Exactech will pay Agency an amount equal to seven and one half percent (7.5%) of the total sales in the Territory during the trailing twelve (12) months ending on such termination date," sets the amount of each payment. Thus, Exactech must make a payment of 7.5 percent of the total sales from the trailing 12-month period to Midwest each month for six months. The plain and ordinary meaning of Paragraph 5.D.ii aligns with Midwest's, rather than Exactech's, interpretation.

To endorse Exactech's contrary position—that RPC is limited to 7.5 percent of sales during the preceding 12 months to be paid out in six monthly installments—we would have to eliminate or read-in language. Either we would need to ignore the first phrase—"during each calendar month of the first six (6) months after such termination"—or we would need to insert or infer language about the total payment being made through equal monthly installments. In other words, to read Paragraph 5.D.ii as Exactech advocates, we would have to rewrite or modify unambiguous contract language, which Minnesota law prohibits, and which we decline to do. Travertine Corp., 683 N.W.2d at 271; see also Am. Com. Ins. Brokers, Inc. v. Minn.

Mut. Fire & Cas. Co., 551 N.W.2d 224, 227–228 (Minn. 1996) ("If no ambiguity exists, there is no reason for construction, and the court is bound to attribute the usual and accepted meaning to the phrase.").

Nevertheless, Exactech argues that the court must construe Paragraph 5.D.ii in light of the rest of the contract and should thus reject Midwest's position because it would lead to an unreasonable, harsh result for Exactech and a windfall for Midwest. Exactech is correct that under Minnesota law, courts consider a relevant contractual provision in the context of the entire contract and the parties' positions at the time of contract formation to determine "what they reasonably meant to accomplish in view of the contract as a whole, its plain language, and the surrounding circumstances." Qwinstar, 882 F.3d at 754 (quoting Ecolab, Inc. v. Gartland, 537 N.W.2d 291, 295 (Minn. Ct. App. 1995)). This includes reading a contract so as to harmonize all clauses and avoid rendering a portion meaningless. Id. at 754–55. Further, courts "read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result." Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998); see also Am. Com. Ins. Brokers, 551 N.W.2d at 230 (interpreting insurance contract as a whole to avoid "potentially unlimited windfall of recovery").

Here, however, nothing in the remainder of the Agreement contradicts the plain meaning of Paragraph 5.D.ii. No one disputes that the purpose of RPC is to compensate Midwest during the non-compete period, but there is no evidence of the parties' intent with respect to the amount of RPC owed other than the unambiguous language of the relevant provision itself. Indeed, there is no claim of unilateral or mutual mistake presently before the court that would permit consideration of the parties' intent apart from the plain language of the Agreement. And though the plain language may result in a large sum paid to Midwest by Exactech as RPC, there is no evidence—other than the parties' self-serving arguments—as to why this amount is or is not an absurd result. As such, we are bound to give Paragraph 5.D.ii its plain and ordinary meaning. See Motorsports Racing Plus, 666 N.W.2d at 323. To conclude otherwise would be to substitute our views of the contract or our inferences

about RPC for the parties' intent as indicated by the clear and unambiguous language of Paragraph 5.D.ii, terms that the parties negotiated and to which they ultimately agreed.

## III.

For the foregoing reasons, we conclude that the district court did not apply the plain and ordinary meaning of Paragraph 5.D.ii as required by Minnesota law, and we reverse and remand the case for further proceedings consistent with this opinion.

_____